NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-5268

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees*,

v.

U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, et al.,
*Defendants-Appellants*.

---

Appeal from the United States District Court for the District of Columbia
No. 1:23-cv-03343 (Hon. Sparkle L. Sooknanan)

---

**FEDERAL APPELLANTS' MOTION FOR STAY PENDING APPEAL**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

ROBERT LUNDMAN
REBECCA JAFFE
AMY E. COLLIER
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-5360
amy.collier@usdoj.gov

Of Counsel:
ARLYNNELL DICKSON
SUSAN ELY
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

GLOSSARY ........ viii

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Statutory Background ........ 3

1. The ESA ........ 3

2. SMCRA ........ 4

3. The Intersection between SMCRA and the ESA ........ 5

B. Factual Background ........ 7

C. Prior Proceedings ........ 8

1. *Zeldin* ........ 8

2. The District Court's Decision ........ 10

ARGUMENT ........ 10

I. The equitable factors warrant a stay. ........ 11

A. The vacatur order irreparably harms energy production and national security ........ 11

B. A stay will not harm Plaintiffs. ........ 17

II. Defendants are likely to succeed on appeal ........ 18

A. *Zeldin* is wrong, and the government has petitioned for en banc hearing in both *Zeldin* and this case....................................19

B. The district court ignored key distinctions between this case and *Zeldin*. ........................................................................21

C. The vacatur order is unjustified........................................................23

CONCLUSION ..............................................................................................25

CERTIFICATE OF COMPLIANCE ...............................................................27

# TABLE OF AUTHORITIES

## Cases

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
515 U.S. 687 (1995)........................................................................16

*Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. EPA*,
72 F.4th 284 (D.C. Cir. 2023)..........................................................24

*Center for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026)......... 2, 8, 9, 10, 17, 18, 19, 20, 21, 22, 23, 24

*Cooling Water Intake Structure Coal. v. EPA*,
905 F.3d 49 (2d Cir. 2018) ..................................................8, 9, 19, 20

*Gill v. Whitford*,
585 U.S. 48 (2018)..........................................................................25

*Hodel v. Va. Surface Min. & Reclamation Ass'n*,
452 U.S. 264 (1981)..........................................................................5

*Madsen v. Women's Health Ctr.*,
512 U.S. 753 (1994)..........................................................................25

*NPS v. Nat'l Trust for Hist. Preservation*,
609 U.S. --, 2026 WL 2564318 (Aug. 31, 2026) ....................................17

*Nken v. Holder*,
556 U.S. 418 (2009)..........................................................................11

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ............................................................15

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986)..................................................15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)..........................................................................24

*Winter v. NRDC*,
555 U.S. 7 (2008)....................15, 17

**Statutes and Court Rules**

Endangered Species Act
16 U.S.C. § 1532(19)....................16
16 U.S.C. § 1533(d)....................3
16 U.S.C. § 1536(a)(2)....................3
16 U.S.C. § 1536(a)(3)....................3
16 U.S.C. § 1536(a)(4)....................3
16 U.S.C. § 1536(b)(3)(A)....................3
16 U.S.C. § 1536(b)(4)(C)....................3
16 U.S.C. § 1536(o)....................4
16 U.S.C. § 1538(a)(1)(B)....................3
16 U.S.C. § 1539(a)(1)(B)....................4
16 U.S.C. § 1539(a)(2)(A)....................4
16 U.S.C. § 1539(a)(2)(B)....................4
16 U.S.C. § 1539(c)....................4

Surface Mining Control and Reclamation Act
30 U.S.C. § 1201(b)....................11
30 U.S.C. § 1201(j)....................11, 12, 17
30 U.S.C. § 1201(f)....................5, 20
30 U.S.C. § 1202(a)....................4
30 U.S.C. § 1202(f)....................11
30 U.S.C. § 1252(e)....................5
30 U.S.C. § 1253(a)....................5, 20
30 U.S.C. § 1253(a)(1)....................21
30 U.S.C. § 1255....................21
30 U.S.C. §§ 1256-1264....................4
30 U.S.C. § 1257(b)....................6
30 U.S.C. §§ 1265-1266....................4
30 U.S.C. § 1265(b)....................6
30 U.S.C. § 1265(b)(24)....................4
30 U.S.C. § 1266(b)....................6
30 U.S.C. § 1266(b)(11)....................4
30 U.S.C. § 1267....................5
30 U.S.C. § 1271....................5

## Regulations

30 C.F.R. Ch.VII, Subch. T ....................5

30 C.F.R. § 773.5 ....................5

30 C.F.R. § 773.6(a)(3)(ii) ....................7

30 C.F.R. § 773.15(j) ....................6, 18, 21

30 C.F.R. § 780.16 ....................18

30 C.F.R. § 780.16(a)....................6, 21

30 C.F.R. § 780.16(b) ....................6, 21

30 C.F.R. § 780.16(c)....................6, 21

30 C.F.R. § 784.21(a)....................6, 21

30 C.F.R. § 784.21(b) ....................6, 21

30 C.F.R. § 816.97(b) ....................5, 6, 18

30 C.F.R. § 816.97(f) ....................18

30 C.F.R. § 817.97(b) ....................5, 6

30 C.F.R. § 840.11(a)....................21

30 C.F.R. § 840.11(b) ....................21

30 C.F.R. § 842.11(c)....................21

50 C.F.R. § 17.22(b) ....................4

50 C.F.R. § 402.01(b) ....................3

50 C.F.R. § 402.02 ....................3

50 C.F.R. § 402.14(g) ....................3

50 C.F.R. § 402.14(h) ....................................................................................3

50 C.F.R. § 402.14(i)(1)(i)................................................................................4

91 Fed. Reg. 43300 (July 14, 2026)...............................................................16

**Other Authorities**

Exec. Order No. 14,154 (Jan. 20, 2025),
90 Fed. Reg. 8353 ..........................................................................................12

Exec. Order No. 14,156 (Jan. 20, 2025),
90 Fed. Reg. 8433 ..........................................................................................11

Exec. Order No. 14,261 (Apr. 8, 2025),
90 Fed. Reg. 15,517 .......................................................................................12

## GLOSSARY

| | |
|---|---|
| BiOp | Biological Opinion |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| OSM | Office of Surface Mining Reclamation and Enforcement |
| SMCRA | Surface Mining Control and Reclamation Act |

## INTRODUCTION

The Court should grant Defendants' motion for a stay pending appeal because the district court's vacatur order disrupts a longstanding cooperative federalism regime that governs coal mining in 24 states, with potentially major consequences for the Nation's energy supply, electricity grid reliability, and national security.

The Surface Mining Control and Reclamation Act (SMCRA) established a cooperative federalism program to govern the regulation of coal mining. Decades ago, as provided in SMCRA, 24 states assumed primary jurisdiction (called "primacy") to issue mining permits and regulate coal mining, subject to federal oversight by the Office of Surface Mining Reclamation and Enforcement (OSM). OSM oversees implementation of regulations requiring primacy states to coordinate with the U.S. Fish and Wildlife Service (FWS) regarding impacts to species and habitat protected under the Endangered Species Act (ESA). Under the federal regulations, FWS provides technical assistance to states to assess potential impacts to protected species and habitat and develop measures to prevent, minimize, and mitigate those impacts.

In 2020, OSM reinitiated consultation with FWS under the ESA regarding OSM's oversight of state primacy programs and implementation of its regulations. FWS issued a biological opinion (BiOp) concluding that the SMCRA regulations

would prevent mining operations in primacy states from jeopardizing protected species or destroying critical habitat. FWS issued an incidental take statement (ITS) that exempted OSM, primacy states, and mining operators from take liability under the ESA for permitted mining operations if—and only if—primacy states coordinate with FWS and include FWS's recommended protective measures as permit requirements.

Plaintiffs sued to challenge the BiOp and ITS. The district court—relying on this Court's fractured decision in *Center for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026)—held that the BiOp and ITS violated the ESA. The district court vacated the BiOp and ITS prospectively as applied to primacy states. Defendants appealed and petitioned for initial hearing *en banc*, along with *en banc* rehearing in *Zeldin*.

The district court's vacatur order eliminated the incidental-take coverage that primacy states rely on, disrupting a longstanding regulatory scheme and causing irreparable harm to the nation's energy reliability and national security during a national energy emergency. Despite finding no specific harms to Plaintiffs from a stay pending appeal, the district court denied Defendants' motion. The Court should preserve the status quo *of more than 40 years* and stay the district court's order pending appeal. Defendants request relief by October 9, 2026.

## BACKGROUND

### A. Statutory Background

#### 1. The ESA

The ESA prohibits taking endangered species and certain threatened species. 16 U.S.C. §§ 1538(a)(1)(B), 1533(d). FWS and the National Marine Fisheries Service (the Services) administer the ESA. 50 C.F.R. § 402.01(b). Under ESA Section 7, federal agencies must consult with the Services to ensure that actions they authorize, fund, or carry out will not jeopardize protected species or destroy critical habitat. 16 U.S.C. § 1536(a)(2)-(4). The Services must "use the best scientific and commercial data available" during consultation. *Id.* § 1536(a)(2).

The Services produce a BiOp that "detail[s]" how the action affects protected species and habitat and whether the action is likely to jeopardize protected species or destroy habitat. *Id.* § 1536(b)(3)(A). The BiOp must evaluate whether adding the action's effects and cumulative effects to the environmental baseline will jeopardize protected species or destroy habitat. 50 C.F.R. § 402.14(g)-(h). Some actions cause "incidental take," which is takings "that result from, but are not the purpose of" the activity. *Id.* § 402.02.

If the Services conclude that the agency action and incidental take will not cause jeopardy or destroy habitat, then they must provide an ITS that "specifies the impact of such incidental taking," 16 U.S.C. § 1536(b)(4)(C), including "the

amount or extent" of the taking, 50 C.F.R. § 402.14(i)(1)(i). Any take that occurs in compliance with an ITS's terms is exempt from ESA liability. 16 U.S.C. § 1536(o).

Section 10 authorizes the Services to issue incidental-take permits for non-federal actions. *Id.* § 1539(a)(1)(B); 50 C.F.R. § 17.22(b). An applicant must submit a habitat conservation plan that addresses enumerated criteria, 16 U.S.C. § 1539(a)(2)(A), and the Service may issue an incidental-take permit only after soliciting public comment and making certain findings, *id.* § 1539(a)(2)(B), (c).

**2. SMCRA**

SMCRA establishes "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). SMCRA regulates these effects primarily through two mechanisms: a permitting system (*id.* §§ 1256-1264) and environmental protection performance standards (*id.* §§ 1265-1266). To engage in coal mining, operators must obtain SMCRA permits. Among other requirements, operators must "minimize disturbances and adverse impacts ... on fish, wildlife, and related environmental values" "to the extent possible using the best technology currently available," and "enhance[] [] such resources where practicable." *Id.* §§ 1265(b)(24), 1266(b)(11).

In enacting SMCRA, Congress intended that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations ... should rest with the States." *Id.* § 1201(f). Thus, Congress designed SMCRA to operate through a cooperative federalism system under which states may assume primacy for the regulation of coal mining, subject to federal approval and oversight. *Id*. § 1253(a). Under this system, states can—"within limits established by federal minimum standards"—"enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 289 (1981). Once OSM has approved a state's regulatory program, the state has "exclusive jurisdiction over the regulation of surface coal mining" on state and private lands. 30 U.S.C. §§ 1252(e), 1253(a). In primacy states, OSM oversees states' implementation, administration, and enforcement of their programs. *Id.* §§ 1267, 1271. There are 24 primacy states, all of which achieved primacy decades ago (the latest in 1983). 30 C.F.R. Ch.VII, Subch. T.

**3. The Intersection between SMCRA and the ESA**

The SMCRA implementing regulations incorporate the ESA's touchstone no-jeopardy requirement, prohibiting surface mining that is "likely to jeopardize the continued existence of endangered or threatened species" or destroy critical habitat. 30 C.F.R. §§ 816.97(b), 817.97(b); *see id.* § 773.5 (regulatory programs

"shall" coordinate "review and issuance of permits ... with applicable requirements of the [ESA].").

Since SMCRA's enactment and OSM's promulgation of the regulations in 1979, the regulatory approach has called for coordination between state regulatory authorities and FWS. Before states may issue permits, applicants must demonstrate that they will meet SMCRA's permit requirements and performance standards. 30 U.S.C. §§ 1265(b), 1266(b), 1257(b). Applicants must submit site-specific fish and wildlife resource information, developed in coordination with FWS, and must submit plans to minimize adverse impacts. 30 C.F.R. §§ 780.16(a)-(c), 784.21(a)-(b). State regulatory authorities must "consult with appropriate State and Federal fish and wildlife agencies" on whether and under what conditions operators may proceed whenever protected species or critical habitat are in the permit area. *Id.* §§ 816.97(b), 817.97(b). Applicants must also identify species-specific protection measures if incidental take is reasonably certain to occur. *Id.* §§ 780.16(b), 784.21(b). And before states can approve any permit application, they must find that the "operation would not affect the continued existence of endangered or threatened species" or destroy critical habitat. *Id.* § 773.15(j). OSM consulted with FWS under the ESA when it promulgated the SMCRA regulations in 1979. It consulted again in 1996 and 2016.

### B. Factual Background

In 2020, OSM asked FWS to review its continued implementation of SMCRA, including its oversight of primacy states' programs. Appx-52. That oversight included coordination between states, OSM, and FWS regarding preventing, minimizing, and mitigating impacts to protected species and critical habitat. States notify FWS about permit applications and provide information about fish and wildlife resources and actions operators will take to minimize adverse impacts. 30 C.F.R. § 773.6(a)(3)(ii); Appx-133-34. And FWS provides technical assistance to help states identify species-specific protective measures to minimize take and protect critical habitat. Appx-133-34; Appx-66-70.

Because SMCRA applies "essentially nationwide" and detailed information about individual future mining activities was unavailable, FWS could not meaningfully analyze site-specific and species-specific effects in the BiOp. Appx-107. Instead, FWS conducted a programmatic assessment of the technical assistance process through which states and FWS coordinate to identify potential effects from individual permits and minimize or mitigate those effects through species-specific protective measures. Appx-107-14. FWS concluded that OSM's implementation of SMCRA and oversight of primacy states, through its existing regulations, was not likely to jeopardize ESA-listed species or destroy critical habitat. Appx-127.

Finding no jeopardy, FWS issued an ITS. It explained that the "paucity of information regarding future mining projects" prevented it from identifying specific locations in which future mining projects would occur, specific activities associated with particular permits, and how much take might result. Appx-129-32. Take would thus be quantified and evaluated on a project-specific basis through the technical assistance process. Appx-129-30. The ITS provided that OSM, state regulatory authorities, and mine operators would be exempt from ESA liability only if those entities followed the technical assistance process and included any necessary species-specific protective measures. Appx-129-30.

### C. Prior Proceedings

Plaintiffs challenged the 2020 BiOp and ITS, claiming that they violate the ESA.

#### 1. *Zeldin*

While this case was pending, a fractured panel of this Court decided *Zeldin* and vacated a technical-assistance-based BiOp and ITS. Florida had applied to the Environmental Protection Agency (EPA) to assume authority to issue permits under Clean Water Act Section 404, and EPA consulted with FWS under ESA Section 7. Using a process similar to one the Second Circuit upheld, *see Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018), FWS issued a BiOp analyzing the technical assistance process built into Florida's program,

which required Florida to coordinate with FWS on a permit-by-permit basis. *Zeldin,* 171 F.4th at 370-72. FWS concluded that the mandatory technical assistance process would minimize incidental take and prohibit Florida from issuing any permits that would jeopardize ESA-listed species. *Id.* FWS also issued an ITS exempting EPA, Florida, and Florida's future permittees from ESA liability for future incidental take from state-issued permits. *Id.*

A divided panel held that FWS's BiOp violated the ESA, rejecting *Cooling Water* as "unpersuasive" and creating a circuit split. *Zeldin*, 171 F.4th at 378; *id.* at 395-97 (Judge Henderson dissenting and deeming *Cooling Water* "correctly decided"). The panel unanimously held that FWS's ITS was unlawful even though *Cooling Water* upheld a nearly identical ITS. *Id.* at 379-81, 386-87, 394. But the panel reached no majority reasoning on the BiOp. Judge Pan said the BiOp was deficient because the technical assistance process was less protective than ESA Section 7 consultation. *Id.* at 377-79. Judge Wilkins concurred in Judge Pan's judgment but not in her analysis, stating instead that the BiOp was unlawful because its no-jeopardy finding depended on the deficient ITS. *Id.* at 384-88. Judge Henderson disagreed regarding the BiOp, stating that it satisfied the ESA and that FWS's no-jeopardy determination was valid "in light of future structural safeguards." *Id.* at 403.

### 2. The District Court's Decision

In May 2026, the district court relied on *Zeldin* to conclude that the SMCRA BiOp and ITS violate the ESA. ADD-27a-28a.

First, the court explained that the ITS "violates the ESA because it does not set a clear and enforceable incidental take limit." ADD-27a-29a. Second, relying primarily on Judge Pan's reasoning, the court held that the 2020 BiOp is "invalid because it does not include a robust effects analysis and relies on a technical assistance coordination process that is not as protective as Section 7 consultation." ADD-27a; ADD-29a-32a. And although the court recognized that the SMCRA technical assistance process "does not suffer from all the same deficiencies as the process in *Zeldin*," the court found that it was "functionally identical to the approach that Judge Pan rejected in *Zeldin*." ADD-29a-31a. The district court vacated the BiOp and ITS prospectively as applied to primacy states. ADD-34a-35a.

Defendants sought a stay pending appeal, which the district court denied. ADD-48a.

## ARGUMENT

In deciding whether to grant a stay pending appeal, this Court considers (1) likelihood of success on the merits; (2) irreparable harm; (3) whether a stay would

substantially injure other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

Here, each factor supports a stay pending appeal. The vacatur order has significant implications for energy reliability and national security, whereas Plaintiffs have failed to show any imminent harm from maintaining the longstanding status quo. The district court is also wrong on the merits, and Defendants are likely to prevail on appeal.

## I. The equitable factors warrant a stay.

### A. The vacatur order irreparably harms energy production and national security.

Vacating the BiOp and ITS hinders coal mining operations and risks energy stability and national security. The district court disregarded these irreparable harms.

Congress enacted SMCRA to, among other things, "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided." 30 U.S.C. § 1202(f). Coal mining operations "contribute significantly to the Nation's energy requirements" and "contribute to the economic well-being, security, and general welfare of the Nation." *Id.* § 1201(b), (j). The President declared a national energy emergency and recognized that reliable, diversified, and affordable energy supplies are crucial to America's economic and national security. *See* Exec. Order No. 14,156 (Jan. 20, 2025), 90

Fed. Reg. 8433; Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353. Coal is "essential to our national and economic security" and "critical to meeting the rise in electricity demand due to the resurgence of domestic manufacturing and the construction of artificial intelligence data processing centers." Exec. Order No. 14,261 (Apr. 8, 2025), 90 Fed. Reg. 15,517.

The vacatur harms the public interest by disrupting the "economic well-being, security, and general welfare of the Nation." 30 U.S.C. § 1201(j). Without the take coverage under the 2020 ITS, primacy states have no readily available means of avoiding ESA take liability. Appx-13-14, ¶¶ 25-26. ESA Section 10 is a statutory option, but, in practice, processing individual Section 10 applications for all SMCRA permits that require incidental-take coverage would be unmanageable. Appx-11-13, ¶¶ 22, 24 (discussing challenges of developing statewide conservation plans for all primacy states). There are currently 298 state-issued SMCRA permits with incidental-take coverage. Appx-11-13, ¶¶ 21, 24. The order forces primacy states to choose between denying or delaying new permit applications (as well as renewals and permit revisions) that require incidental-take coverage unless operators can secure alternate means of coverage, or allowing those operations to proceed without incidental-take coverage at risk of liability for any illegal incidental take.

The order covers the states that produce over 99% of domestic coal and has the potential to disrupt 432 mines across 13 states, risking billions of dollars in coal-mining revenue. Appx-35-39, ¶¶ 4, 12-13. West Virginia, Kentucky, and Virginia account for approximately 21% of overall domestic coal output. Appx-37-38, ¶ 9. The order is likely to disrupt at least 117 permitting decisions and nearly 7 million tons of coal production each year in just these three states. Appx-22-23, ¶ 27; Appx-35-36, ¶ 5.

These disruptions could impact the domestic supply of energy and national security. In 2025, coal supplied 16.7% of generation to PJM Interconnection and 29.1% to the Midcontinent Independent System Operator, which together provide power to 23 states and over 100 million people. Appx-36, ¶ 6. Any reduction in coal availability raises prices for ratepayers, particularly during emergencies. *Id.* PJM, which serves the Eastern United States, is more exposed to the reliability implications of the vacatur because it relies heavily on Appalachian-sourced coal. *Id.*

The Department of War consumes an exceptional amount of energy, and its domestic installations depend on the commercial electric grid to conduct their missions. Appx-43, ¶¶ 5-6. For example, PJM encompasses bases that house critical, non-interruptible military functions, including U.S. Cyber Command and the National Security Agency. Appx-44, ¶ 10. A failure of the commercial grid

serving these sites threatens the Department's ability to command forces globally, execute cyber defense operations, and process national-level intelligence. *Id.*

The United States is experiencing extraordinary electricity demand growth, and coal-fired generation contributes materially to addressing this demand. Appx-38, ¶ 11. Because coal can be stored on-site in large quantities, coal-fired generation offers fuel assurance and stability during emergencies, periods of grid stress, or interruptions affecting other fuel supplies. Appx-44, ¶ 9. Any market impact that takes energy resources off the table, even temporarily, will impact the cost-effectiveness, reliability, and capacity needed to meet rising demand at this critical time. Appx-38, ¶ 11.

Moreover, domestic steel manufacturing relies on metallurgical coal. Appx-37, ¶ 8. Steel manufacturing is vital to producing military assets, including naval vessels, armored vehicles, and missile systems. *Id.*; Appx-45, ¶ 14. Over half of all metallurgical coal produced in this country comes from West Virginia. Appx-24-25, ¶ 33. The high quality of West Virginia's metallurgical coal makes it invaluable. *Id.* In fact, every steelmaking facility in North America relies on metallurgical coal produced in West Virginia for at least half of its feedstock needs. *Id.* Even a small impact on West Virginia coal mining could trigger national implications for steelmaking and national security. Appx-38, ¶ 10. If American supplies are unavailable, the military must look abroad for metallurgical coal, and

other countries, such as China, can strategically disrupt supply chains. Appx-46, ¶ 15.

The district court erroneously disagreed that these harms are irreparable, describing them as "harms to 'money, time and energy' of regulated parties" and "administrative burdens and staffing limitations." ADD-43a-44a. But the declarations from government officials explain that the harms arise from the risk, instability, and uncertainty created by the disruption of the longstanding status quo, which jeopardizes energy production that the government and Americans rely on. *See* Appx-35-37, ¶¶ 5-7; Appx-45, ¶ 13; Appx-12-13, ¶¶ 23-24. And Defendants need not prove that the vacatur order will lead to "a complete eradication of the Nation's coal supply" to establish irreparable harm. *See* ADD-45a. The Supreme Court has instructed courts to "defer to" military officials' "specific, predictive judgments" about how injunctive relief will affect military preparedness. *Winter v. NRDC*, 555 U.S. 7, 27 (2008). Courts also have granted temporary injunctive relief to preserve access to reliable and affordable electricity. *See, e.g. Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (citing "public's interest in ready access to affordable electricity"); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (public interest favored preliminary injunction necessary to preserve power supply to public).

In district court, Plaintiffs argued that a new rule adopted by the Services potentially eliminates any irreparable harm. ADD-45a-47a. That rule, which goes into effect September 14, 2026, rescinds the regulatory definition of "harm" under the ESA and instead relies on the language in the statute. 91 Fed. Reg. 43300 (July 14, 2026); *see* 16 U.S.C. § 1532(19). By rescinding the regulatory definition of harm, the rule removes habitat modification from the definition of "harm" and clarifies that lawful activities not directed at the take of species are not harm. 91 Fed. Reg. at 43301-02; *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 719-23 (1995) (Scalia, J., dissenting). The rule does not define the other statutory definitions of "take"—i.e., it does not address "harass, ... pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). The rule is subject to ongoing litigation, including by some Plaintiffs here, *see CBD v. Burgum*, No. 2:26-cv-2474 (W.D. Wash.), yet Plaintiffs rely on the rule to discount Defendants' asserted irreparable harms. ADD-45a-47a. Defendants are confident that the new rule will be upheld, but, at least in the meantime, primacy states and mine operators will need take coverage before undertaking certain activities that risk liability under either the old or new interpretation of "harm." Given the case-by-case application of the new rule, the uncertainty created by litigation challenging it, and the substantial risk of civil or

criminal liability for ESA violations, this new rule will not appreciably reduce the harms caused by the district court's vacatur in the near term.

There is no reason to interfere with the agencies' approach to ESA compliance over the past 40-plus years while this appeal is decided, especially where the district court's vacatur harms the public. A stay pending appeal is warranted.

**B. A stay will not harm Plaintiffs.**

Plaintiffs' alleged injuries to their members' interests in "hiking, fishing, and observing wildlife" (ECF 13 ¶ 2) do not outweigh the public's energy and national security interests. In *Winter*, the Supreme Court rejected the notion that recreational and aesthetic interests in rare marine mammals could outweigh national defense interests. 555 U.S. at 26, 33; *see also NPS v. Nat'l Trust for Hist. Preservation*, 609 U.S. --, 2026 WL 2564318 (Aug. 31, 2026). Plaintiffs' members' interests here are largely recreational and do not outweigh the "economic well-being, security, and general welfare of the Nation." 30 U.S.C. § 1201(j). Alleged disruption to Plaintiffs' recreational interests does not outweigh those stakes.[1]

---

[1] Plaintiffs have demonstrated no urgency in this litigation, which is hardly surprising when they are challenging a system in place since 1979. In June 2025, Plaintiffs moved to stay the case indefinitely pending a decision in *Zeldin*. Plaintiffs opposed Defendants' request to resume litigation in August 2025 and

Moreover, the district court made no factual findings and identified no record evidence showing that staying the vacatur would harm Plaintiffs. *See* ADD-42a-47a; ADD-34a-35a (finding BiOp and ITS facially invalid but finding no harms from any specific permit). During the stay, primacy states must continue to coordinate with FWS to ensure that ESA-listed species are protected, as SMCRA and the regulations mandate. For example, existing SMCRA regulations protect habitats of unusually high value and prohibit surface mining activity that is "likely to jeopardize the continued existence" of ESA-listed species or destroy critical habitat. 30 C.F.R. § 816.97(b), (f); *see also id.* §§ 773.15(j) (states must find that operations "would not affect the continued existence" of ESA-listed species), 780.16.

The balance of harms and public interest therefore decisively favor a stay.

## II. Defendants are likely to succeed on appeal.

Defendants are likely to succeed on the merits. Defendants have petitioned for en banc rehearing in *Zeldin* and initial en banc hearing in this case; both petitions identify serious flaws in the *Zeldin* ruling. Given those flaws and the *Zeldin* panel's fractured opinions, Defendants are likely to succeed in arguing that the district court—which relied entirely on *Zeldin*—erred. Moreover, the district

---

again sought to maintain the stay in February 2026. Plaintiffs' efforts to stay this case belie any claim that they will be injured by a stay pending appeal.

court failed to consider meaningful differences between the SMCRA technical assistance process and the *Zeldin* process.

### A. *Zeldin* is wrong, and the government has petitioned for en banc hearing in both *Zeldin* and this case.

As the government argues in its *Zeldin* en banc rehearing petition, the *Zeldin* panel erroneously rejected a BiOp and ITS analyzing technical assistance and created a circuit split.

To begin, the BiOp in *Zeldin*, like the BiOp here, properly analyzed the programmatic effects of the action, which relied on technical assistance to ensure that individual permitting decisions would not jeopardize any ESA-listed species. The key question in *Zeldin*, as Judge Henderson explained in her dissent, is whether FWS can "rely on structural safeguards in Florida's program to reach a no-jeopardy determination without conducting an analysis of potential harm to each individual species and habitat?" 171 F.4th at 395. The answer is "it plainly can." *Id.*

The parallel question here is whether FWS can rely on the structural safeguards in the SMCRA technical assistance process to reach a no-jeopardy determination, and the answer is again that it can. "The protections of the technical assistance process more than justif[ied] FWS's no-jeopardy determination." *Id.* at 404 (Henderson, J, dissenting). The Second Circuit in *Cooling Water* held that the Services were "authorized ... to defer consideration of thermal impacts to the site-

specific permitting process." 905 F.3d at 74. In *Zeldin* and in this case, just as in *Cooling Water*, FWS appropriately "rel[ied] on the protections of the technical assistance process" and "defer[red] consideration of [] impacts to the site-specific permitting process." *Id.* at 74-75. FWS was "free to point to the procedural safeguards that attach to future permits—the technical assistance process that guarantees eventual site- and species-specific assessments—as a basis for its no jeopardy finding." *Zeldin*, 171 F.4th at 395 (Henderson, J, dissenting).

The *Zeldin* panel also erroneously rejected the ITS, and the district court made the same mistake in rejecting the SMCRA ITS. An ITS that contains no numerical cap "is adequate if it explains why it was impracticable to express a numerical measure of take." *Cooling Water*, 905 F.3d at 77 (cleaned up). Here, FWS could not analyze anticipated take at the species- and site-specific level due to the paucity of available information about future mining project locations. Appx-129. And that is a central tenet of SMCRA, not a recent interpretation by the agencies—SMCRA creates a cooperative federalism structure, where primacy states have "exclusive jurisdiction" over permitting decisions and considering site-specific impacts due to the "diversity in terrain, climate, biologic, chemical, and other physical conditions" in mining areas. 30 U.S.C. §§ 1201(f), 1253(a). Accordingly, "the amount and extent of incidental take anticipated from these proposed actions will be quantified by [FWS] and evaluated on a project-specific

basis through the SMCRA Coordination Process." Appx-129-30. FWS adequately explained why a numerical measure of take was impractical at this stage.

### B. The district court ignored key distinctions between this case and *Zeldin*.

The SMCRA technical assistance process differs from the process in *Zeldin*, and the district court erroneously equated the processes. As Judge Pan recognized in *Zeldin*, "structural safeguards in the form of deferred site- and species-specific assessments might be sufficient in some circumstances." 171 F.4th at 379. SMCRA's process is one of those circumstances.

SMCRA's technical assistance process is codified in longstanding federal regulations and includes mandatory ESA protections. These regulations set minimum standards for state-issued permits. 30 U.S.C. §§ 1253(a)(1), 1255. Each permit application must include fish and wildlife resource information and a protection and enhancement plan, with the required details determined "in consultation with" state and federal wildlife agencies. 30 C.F.R. §§ 780.16(a)-(c), 784.21(a)-(b). States cannot approve a permit unless the application "affirmatively demonstrates and the regulatory authority finds" that the operation would "not affect the continued existence of" ESA-listed species or destroy critical habitat. *Id.* § 773.15(j). States must also regularly inspect mining operations, and OSM maintains authority to conduct federal inspections and order corrective measures or cessation of activities. *Id.* §§ 840.11(a)-(b), 842.11(c).

FWS evaluated the SMCRA regulations and reasonably concluded that OSM had "structured its SMCRA regulatory program to ensure that its implementation is not likely to jeopardize" ESA-listed species or destroy critical habitat. Appx-126. The district court nevertheless evaluated the 2020 BiOp as though it was analyzing the initial transfer of federal permitting authority to states. ADD-30a ("[T]he technical assistance process takes key responsibilities assigned to the consulting agency" and "delegates them to state regulatory authorities"). But unlike *Zeldin*, state assumption of authority happened decades ago and is not at issue here. In applying *Zeldin*, the district court faulted the 2020 BiOp for inadequately analyzing the effects of an action that it did not purport—and was not required—to analyze.

The district court also misunderstood the SMCRA ITS. The court held that, "[l]ike the ITS in *Zeldin*, the 2020 ITS lacks a clear take limit that, if exceeded, can effectively trigger immediate reinitiation of consultation." ADD-28a-29a (citations omitted). But, during the technical assistance process, FWS quantifies incidental take for individual permits, and permitted operations are exempt from take liability only if the state includes in the permit the measures FWS determines are necessary to minimize take. Appx-130. FWS and the states "review reports and track the levels" of incidental take for individual permits, Appx-130, and if any take limit is

exceeded, the state must contact FWS "within 48 hours to review the need for additional [species-specific protective measures]." *See, e.g.*, Appx-143-44.

The district court failed to grapple with these points and misunderstood the SMCRA technical assistance process.

**C. The vacatur order is unjustified.**

The district court's vacatur order is unjustified and too broad.

First, the district court erred by relying solely on *Zeldin* to vacate the BiOp and ITS without analyzing whether vacatur is the appropriate remedy. The circumstances—and the consequences of vacatur—are fundamentally different from *Zeldin*. In affirming vacatur of EPA's approval of Florida's application to assume permitting authority, *Zeldin* concluded that it would not be "unduly disruptive for [Clean Water Act] Section 404 permitting authority to revert to the Corps, which was responsible for issuing such permits before Florida implemented the program under review." 171 F.4th at 383. Section 404 permits issued by the Corps are federal actions subject to site-specific consultation under ESA Section 7. There is no analog here because permitting authority has rested with primacy states for over 40 years and remains with the states notwithstanding the district court's vacatur. Thus, the vacatur creates a dilemma that was not present in *Zeldin*: primacy states have permitting authority but no readily available means of obtaining incidental-take coverage. *See* Appx-12-14, ¶¶ 23-26 (describing myriad

complications under Section 10). Without incidental-take coverage, mine operators may have to cease operations. Appx-35, ¶ 4. The district court erred in failing to consider these far-reaching, disruptive consequences, which are distinct from those in *Zeldin*.

The district court also erred in vacating the BiOp and ITS for all 24 primacy states because the court acknowledged that the "specific harms that the Plaintiffs identify" are *only* in three states: Kentucky, Virginia, and West Virginia. ADD-34a.

"[J]udicial remedies should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs or petitioners." *Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (quotation omitted). The Supreme Court recently reiterated this, explaining that universal injunctions that grant relief to nonparties "likely exceed the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.*, 606 U.S. 831, 837-38 (2025). The key question is "whether an injunction will offer complete relief *to the plaintiffs before the court*," and the Court has "consistently rebuffed requests for relief that extended beyond the parties." *Id.* at 852, 843.

While *CASA* did not resolve "whether the [APA] authorizes federal courts to vacate federal agency action," *id.* at 847 n.10, the district court's universal vacatur is contrary to constitutional and equitable principles. Universal remedies are in

tension with both Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (emphasis added), and the rule in equity that relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (quotation omitted).

Here, the district court identified no specific harm to Plaintiffs in the three identified states, let alone the remaining 21 states. ADD-32a-35a. The vacatur order was thus unjustified.

## CONCLUSION

This Court should stay the district court's order pending appeal.

Respectfully submitted,

/s/ *Amy E. Collier*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT LUNDMAN
REBECCA JAFFE
AMY E. COLLIER
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-5360
amy.collier@usdoj.gov

Of Counsel:

ARLYNNELL DICKSON
SUSAN ELY
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

September 4, 2026
DJ 90-8-6-08681

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 5,197 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Amy E. Collier*
AMY E. COLLIER

Counsel for the United States