**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 26-5268

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees*,

v.

U.S. OFFICE OF SURFACE MINING RECLAMATION
AND ENFORCEMENT, et al.,
*Defendants-Appellants*.

---

On Appeal from the United States District Court for the District of Columbia
No. 1:23-cv-03343 (Hon. Sparkle L. Sooknanan)

---

# PLAINTIFFS-APPELLEES' OPPOSITION TO APPELLANTS' MOTION FOR STAY PENDING APPEAL

---

HANNAH CONNOR
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
Tel.: (202) 641-6176
hconnor@biologicaldiversity.org

ERIC GLITZENSTEIN
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
Tel.: (202) 849-8401
eglitzenstein@biologicaldiversity.org

Dated: September 17, 2026

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

Parties: Plaintiffs-Appellees are the Center for Biological Diversity and Appalachian Voices.

Defendants-Appellants are Office of Surface Mining Reclamation and Enforcement (OSMRE); Lanny E. Erdos, in his official capacity as Director of the Office of Surface Mining Reclamation and Enforcement; United States Fish and Wildlife Service (FWS); Douglas Burgum, in his official capacity as Secretary of the U.S. Department of the Interior; and Brian Nesvik, in his official capacity as Director of the U.S. Fish and Wildlife Service.

Limited Amici Before this Court: The State of West Virginia and Commonwealth of Kentucky have submitted a motion for leave to file an amicus brief in support of OSMRE's motion for a stay pending appeal (Doc. No. 2192497).

## B. Rulings Under Review

Defendants-Appellants appeal the district court's May 29, 2026 order.

## C. Related Cases

Pursuant to Circuit Rule 28(a)(1)(C), the case on review was not previously before this Court and there are no related cases pending before this Court or the

U.S. District Court for the District of Columbia because no cases involve the same parties or factual background. However, the case *Center for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026) (D.C. Cir. No. 24-5101), involves both Plaintiff-Appellee the Center for Biological Diversity and Defendants-Appellants FWS and Brian Nesvik, in his official capacity as Director of FWS, and raises similar legal issues under the Endangered Species Act and Administrative Procedure Act.

*/s/ Hannah Connor*
Hannah Connor

*Attorney for Plaintiffs-Appellees*

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... ii

TABLE OF AUTHORITIES ........ v

GLOSSARY ........ vii

INTRODUCTION ........ 1

BACKGROUND ........ 4

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. Defendants Are Not Likely to Succeed on the Merits ........ 7

A. Defendants' Disagreement With *Zeldin* Undercuts Rather Than Supports Their Request for a Stay ........ 7

B. The District Court Carefully Considered Any Distinctions Between this Case and *Zeldin* ........ 9

C. The Court Properly Weighed the *Allied-Signal* Factors to Determine that Partial Vacatur was Warranted ........ 11

II. Defendants Have Failed to Demonstrate Irreparable Harm ........ 12

A. Defendants Have Provided No Evidence of Any Impact on Coal Production and Section 10 of the ESA Provides a Lawful, Available Route for Take Coverage ........ 13

B. The Services' Rescission of the Definition of "Harm" Undermines Appellants' Arguments Regarding Irreparable Injury During the Pendency of this Appeal ........ 14

III. The Balance of Equities and Public Interest Also Weigh Against a Stay ..... 18

CONCLUSION ........ 19

CERTIFICATE OF COMPLIANCE ........ 20

CERTIFICATE OF SERVICE ........ 21

# TABLE OF AUTHORITIES

**Cases**

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ....................18

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290, 297 (D.C. Cir. 2006) ....................16

*Citizens for Resp. & Ethics in Wash. v. FEC*,
904 F.3d 1014 (D.C. Cir. 2018) ....................7, 10

*Conservation L. Found. v. Ross*,
422 F. Supp. 3d 12 (D.D.C. 2019) ....................18

*Cooling Water Intake Structure Coal. v. EPA*,
905 F.3d 4 (2d Cir. 2018) ....................9

*Ctr. for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020) ....................18

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) .................... 2, 8, 11

*Ctr. for Biological Diversity, et al., v. Burgum, et al.*,
No. 2:26-cv-02474-TMC (W.D. Wash. July 14, 2026) ....................16

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ....................6

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ....................12

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
23 F.3d 1508 (9th Cir. 1994) ....................7

*Nken v. Holder*,
556 U.S. 418 (2009) .................... 2, 7, 12

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ....................12

*TVA v. Hill*,
437 U.S. 153 (1978) ....................7, 18

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ....................13

**Statutes**

16 U.S.C. § 1536(a)(2) ........................................................................ 10

16 U.S.C. § 1539(a)(1)(B) ........................................................................ 3

**Other Authorities**

91 Fed. Reg. 43300 (July 14, 2026) ........................................................ 3, 15

D.C. Cir. R. 27(g)(4) ........................................................................ 1

Heather Harl et al., *Habitat conservation plans under the endangered species act: A comprehensive three-decade analysis*, 7(6) Conserv. Sci. and Practice e70061 (May 2025). ........................................................................ 14

## GLOSSARY

| | |
|---|---|
| ADD | Defendant-Appellants' Addendum |
| BiOp | Biological Opinion |
| ESA | Endangered Species Act |
| ITP | Incidental Take Permit |
| ITS | Incidental Take Statement |
| OSMRE | Office of Surface Mining Reclamation and Enforcement |
| Service | U.S. Fish and Wildlife Service |
| SMCRA | Surface Mining Control and Reclamation Act |

## INTRODUCTION

Plaintiffs-Appellees ("Center") respectfully respond to the Motion of Defendants-Appellants Office of Surface Mining Reclamation and Enforcement ("OSMRE") and U.S. Fish and Wildlife Service ("Service") (collectively, "Defendants") for stay pending appeal (Doc. No. 2191686).[1]

On May 29, 2026, the district court held that the Defendants violated the Endangered Species Act ("ESA") by issuing and relying on a 2020 biological opinion ("BiOp") that "lacks an effects analysis and relies on a technical assistance process that is less protective than [ESA] Section 7 consultation," Defendant-Appellants' Addendum ("ADD") at 32a, and an incidental take statement ("ITS") that "openly violates applicable regulations regarding take amounts and the reinitiation of consultation," ADD-29a (citation omitted). The court then crafted a narrow, prospective vacatur order consistent with this Court's *Allied-Signal* test. ADD-34a-35a. More than 45 days later, on July 15, 2026, the government filed a motion for stay that, following briefing, the district court denied on August 19,

[1] The Center's response is timely filed in accordance with the unopposed three-day extension agreed to by Defendants (Doc. 2192075), as well as D.C. Cir. R. 27(g)(4), which provides for an automatic extension in situations where a moving party timely moves for an extension (Doc. 2192075), confers with opposing counsel, and the court does not act on the motion by the end of the second business day before the filing deadline. While the local rules provide for a 7-day extension in those circumstances, the Center is filing today to ensure its opposition is considered by the Court in ruling on Defendants' motion. D.C. Cir. R. 27(g)(4).

2026, with an extensive explanation why the stay factors are not satisfied. ADD-38a.

Defendants now ask this Court for a stay. But, once again, they do not satisfy the stringent standards for such extraordinary relief. As to likelihood of success on the merits, Defendants have not remotely made the "strong showing" necessary for a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). In reaching its Opinion, the district court correctly applied the plain language of the ESA, supporting regulations, and directly on-point precedent from this Court to find the 2020 BiOp and ITS "openly violate[]" the ESA. ADD-29a, 31a (citing *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026) (hereafter, "*Zeldin*").

Evidently recognizing that they cannot establish a likelihood of success on the merits, Defendants focus on alleged impacts from the loss of incidental take coverage. But their claims regarding injury to national security and energy supplies are unsupported with *any* evidence that the district court's ruling has had—or during the course of an appeal will have—any actual effect on coal production. The Amici States likewise fail to provide any concrete evidence of actual impacts to such production.

In a hollow attempt to establish irreparable injury, Defendants allege that "primacy states have no readily available means of avoiding ESA take liability." Fed. App. Mot. at 12. That argument is baseless for two reasons. First, in Section

10 of the ESA, Congress established a specific process for non-federal entities to obtain take coverage if they wish to pursue activities that will take imperiled wildlife. 16 U.S.C. § 1539(a)(1)(B). Second, the Service's recent adoption of a significant change to the regulatory definition of prohibited "take" and "harm" under the ESA further undercuts the purported injuries Defendants and Amici claim they will experience absent a stay.

Indeed, through that rule change, the Service has made clear that the government no longer considers the effects of habitat modification or degradation on ESA-listed species to be a "take" under Section 9 of the ESA—even when such habitat impacts kill or injure listed species. *See* 91 Fed. Reg. 43300, 43304 (July 14, 2026). Because the entire premise of Defendants' and Amici's irreparable injury argument stems from the need for incidental take coverage, the Service's rescission of the "harm" definition and accompanying declaration that, in Defendants' view, take coverage is now unnecessary for activities such as coal mining that destroy or degrade habitat, means that Defendants cannot satisfy the stringent standards for a stay.

For these and additional reasons addressed below, Plaintiffs-Appellants respectfully requests that the Court deny Defendants' motion.

## BACKGROUND

Plaintiffs-Appellees Center for Biological Diversity and Appalachian Voices brought this case after obtaining extensive evidence that coal mining activities "have led to severe habitat degradation and dramatic population declines across the ranges" of multiple endangered and threatened species." ADD-12a. Notwithstanding Defendants' and Amici's assertions that such species are being adequately protected, the record evidence reflects hundreds of instances of "chronic non-compliance" with measures ostensibly designed to safeguard species at grave risk of extinction. ADD-12a.

In its Opinion granting summary judgment for the Center, the district court identified several ways in which the BiOp and ITS violate the ESA. As an initial matter, Judge Sooknanan carefully parsed this Court's ruling in *Zeldin* which addressed a similar approach to ESA compliance. ADD-21a-27a. Judge Sooknanan explained that the *Zeldin* panel "unanimously concluded that that the programmatic ITS issued by the FWS" in that case violated "several [ESA] section 7 regulations," including because the ITS failed to provide any quantification, or any other objective measure, of the amount of take being authorized. ADD-24a. Judge Sooknanan further explained that "both Judge Pan and Judge Wilkins agreed that the BiOp approving Florida's permitting program was unlawful and must be set aside," with Judge Pan finding that "the BiOp failed to include 'a meaningful site-

specific and species-specific analysis,'" as required by ESA regulations, and Judge Wilkins reasoning that a "BiOp cannot be compliant unless it includes an ITS that specifies the impact of incidental taking and the amount or extent of such taking." ADD-26a.

Applying *Zeldin's* holding and reasoning to this case, the district court held that the "ITS that accompanies the 2020 BiOp violates the ESA because it does not set a clear and enforceable incidental take limit," as required by the ESA regulations. ADD-26a; *id*. ("The ITS does not quantify or even estimate the amount or extent of incidental take of ESA-listed species, as the ESA requires."). In addition, finding both Judge Pan's and Judge Wilkins' opinions "persuasive," the court held the BiOp's no-jeopardy finding to be arbitrary and capricious, both because it incorporates an invalid ITS and because the coordination process "is less protective than Section 7 consultation under the ESA." ADD-29a n.4.

Based on these serious ESA violations, the district court imposed the "normal remedy" of vacatur, but limited it to only those actions covered by the unlawful aspects of the BiOp and ITS (i.e., where the SMCRA program has been delegated to States and incidental take coverage was provided to those States without specifying take limits and in reliance on a subsequent coordination process that is less protective than Section 7 consultation) and, consistent with *Zeldin*,

made the vacatur prospective so that it does not affect any previously issued permits. ADD-35a.

Defendants took 47 days before even filing their notice of appeal, at which point they also asked the district court for the stay pending appeal that the court denied. On the merits, Defendants "simply recycle[d] arguments advanced in prior briefing," ADD-39a, and "quarrel[ed] with the D.C. Circuit's binding jurisprudence" on vacatur. ADD-42a. As for irreparable injury, the district court noted that "it has been over two months since the Court entered its Order" and Appellants could point to no actual impact on the coal industry or any other concrete harm. ADD-43a. The court also cited the recent rescission of the regulatory definition of "harm" under the ESA as further undercutting any prospect of irreparable harm during appeal. *Id*.

Appellants then took another two weeks after the district court ruled on their stay motion there to file their stay motion in this Court. The motion makes no new substantive arguments on the merits and relies on the same unsubstantiated allegations of impacts on coal mining rejected by the district court.

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). The party seeking a stay bears the burden of establishing that such relief is warranted. *Citizens for*

*Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018). The "most critical" factors are whether the movant has demonstrated a likelihood of success on the merits and irreparable injury during the time it will take for the appeal to run its course. *Nken*, 556 U.S. at 434. Furthermore, when considering the equities, "[t]he 'language, history, and structure' of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994) (quoting *TVA v. Hill*, 437 U.S. 153, 174 (1978)).

## ARGUMENT

### I. Defendants Are Not Likely to Succeed on the Merits

To receive a stay, the moving party must make a "strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 426. Defendants fall far short of this high bar.

#### A. Defendants' Disagreement With *Zeldin* Undercuts Rather Than Supports Their Request for a Stay

Defendants' primary merits argument is that *Zeldin* is "wrong" and that a stay is somehow warranted because the government requested initial en banc review in this case, along with en banc review in the *Zeldin* case. Mot. at 19. However, the Court has now rejected the request for initial en banc review (Doc. No. 2192065), and Defendants' mere disagreement with the holding or separate

concurrences in *Zeldin* does not demonstrate any likelihood of success in this case. In fact, it demonstrates the opposite.

The district court's methodical opinion accurately summarized *Zeldin* (which itself relied on the plain language of the ESA, its implementing regulations, and controlling law) and then applied its holdings and reasoning to the facts of this case. The district court's ruling is straightforward and correct in holding that the ITS at issue violates the ESA. The *Zeldin* panel unanimously held that a similar ITS—that also broadly authorized the take of listed species without setting any clear limit or criteria for reinitiation of consultation—could not be reconciled with the ESA or implementing regulations. Applying the same analysis here, the district court found the 2020 ITS unlawful because it "'openly violates applicable regulations regarding take amounts and the reinitiation of consultation.'" ADD-28a (quoting *Zeldin*, 171 F.4th at 381).

While Defendants repeatedly refer to *Zeldin* as a "fractured" decision, that characterization ignores the panel's consensus holding that the ITS at issue there was unlawful for essentially the same reasons that the district court here found the SMCRA ITS to be invalid. That alone compels rejection of the motion for stay because the Center is likely, if not certain, to prevail on its claim that the ITS (and thus the BiOp that incorporates the ITS) violates the ESA.[2]

---

[2] Notwithstanding Defendants' preference for the approach to the ITS issue in

### B. The District Court Carefully Considered Any Distinctions Between this Case and *Zeldin*

Defendants' alternative argument that the district court "ignored key distinctions between this case and *Zeldin*" and "erroneously equated the processes" at issue in the two cases, Mot. at 21, is also baseless. In actuality, the district court carefully considered any differences between the coordination and review processes in the two cases and concluded, correctly, that they did not support a different result than that reached in *Zeldin*. *See* ADD-31a.

Thus, while recognizing that the processes are not identical, the district court found that the approach here "is even less protective than the process in *Zeldin* in at least one key respect," *i.e.,* pursuant to the SMCRA BiOp, the views of the expert federal agency on what measures are necessary to avoid the extinction of a species may be rejected or ignored when a permit is issued by a State. ADD-30a (explaining that "even after the Secretary of Interior has proposed that a State regulatory authority require protective measures for a certain mining project, the State may still 'reject the proposed resolution and approve the permit'") (quoting FWS-36713). If anything, that distinction—which Defendants make no effort to refute—renders the process here even more irreconcilable with the ESA's Section

---

*Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018)—involving a different coordination process—the district court correctly considered and applied this Court's precedents along with the plain terms of the ESA and implementing regulations.

7 obligation to "insure" that SMCRA-regulated coal mining activities will not jeopardize the continued existence of endangered or threatened species. 16 U.S.C. § 1536(a)(2).

Nor, contrary to Defendants' assertion, did the "district court misunderst[and] the SMCRA ITS." Mot. at 22. The court understood perfectly well that the ITS "suffers from the same critical deficiencies as the ITS in *Zeldin*" because it does not "quantify or even estimate the amount or extent of incidental take of ESA-listed species that is permitted, as the ESA requires." ADD-28a. Accordingly, in violation of the ESA and implementing regulations, there is no identified level of impact to imperiled species in the SMCRA ITS that could trigger reinitiation of consultation. ADD-28a-29a. This analysis demonstrates the validity of the district court's holding rather than its "failure to grapple" with the coordination process. Mot. at 22.

Defendants merely disagree with the district court's application of established law to the facts of this case. However, they have not demonstrated any flaws in the district court's analysis of *Zeldin*, the differences between the coordination processes at issue in that case and this one, or any other relevant consideration. Defendants have thus failed to establish any, let alone a "substantial," likelihood of success on appeal and their motion should be denied. *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1018.

### C. The Court Properly Weighed the *Allied-Signal* Factors to Determine that Partial Vacatur was Warranted

The district court carefully weighed the *Allied-Signal* factors and, following Circuit precedent, vacated the portion of the 2020 BiOp and ITS found to be unlawful. ADD-32a-35a. Defendants take issue with this partial vacatur but, as with the merits, they fail to support their claim with any showing of error as a matter of law or fact.

Defendants assert that the "district court erred by relying solely on *Zeldin* to vacate the BiOp and ITS without analyzing whether vacatur is the appropriate remedy." Mot. at 23. That is false. In truth, the court expressly "deviate[d] from *Zeldin*'s approach on vacatur," ADD-32a, by only setting aside the 2020 BiOp and ITS as it relates to OSMRE's oversight of primacy states and leaving in place the portion of the BiOp and ITS that relate to "OSMRE's regulation of mining activities in non-primacy states." *Id.* at 33. Further, "to . . . minimize any 'disruptive consequences' from this decision, the court's vacatur of the BiOp and ITS '[was] prospective and [did] not call into question previously issued . . . permits.'" *Id*. at 33-34 (quoting *Zeldin*, 171 F.4th at 383). That exercise of reasoned judgment, which surgically remedied the violations at issue but went no further, is far from an abuse of discretion.

Contrary to Defendants' assertion, the district court did not "err[] in vacating the BiOp and ITS" prospectively for all primary states. Mot. at 24. As the district

court explained in denying the stay motion, Defendants "did not request that relief at the merits stage" but, rather, asked that any vacatur be "'narrowly tailored to just those portions of the 2020 BiOp and ITS that concern [the Office of Surface Mining's] oversight of states with primacy'"—which is precisely what the court then did. ADD-41a. Defendants have therefore waived any argument that the vacatur should have been narrowed even further. In any case, the court's decision to craft a vacatur order commensurate with the scope of the legal violation is entirely consistent with Circuit precedent. *Id.* (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) and *NRDC v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020)).

At bottom, the district court faithfully applied the *Allied-Signal* factors to conclude that partial, prospective vacatur is the proper remedy in this instance. ECF 53 at 33. There is no basis in either the court's sound merits ruling or its carefully-crafted remedy to conclude that Defendants are likely to prevail on appeal.

## II. Defendants Have Failed to Demonstrate Irreparable Harm

Establishing irreparable harm is one of "the most critical" factors when determining whether to issue a stay pending appeal. *Nken*, 556 U.S. at 434. To satisfy this factor, Defendants must show more than just some "possibility of irreparable injury." *See id.* at 433–34. Indeed, "[b]are allegations of what is likely

to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis in original). The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.*

As suggested by Defendants' lackadaisical approach to even seeking a stay, they cannot show any irreparable injury will actually result in the absence of a stay, and they fail to provide any evidence that the district court's Order has had, or will have, any actual effect on coal production during the pendency of this appeal.

### A. Defendants Have Provided No Evidence of Any Impact on Coal Production and Section 10 of the ESA Provides a Lawful, Available Route for Take Coverage

Defendants allege that the lower court's Order will disrupt hundreds of mining operations that require incidental take coverage, thereby threatening national security and energy supplies. Mot. at 11-13. However, as when Defendants sought a stay in the district court, neither they nor the *Amici* States point to *any* evidence of actual disruption in coal mining operations caused by the district court ruling, let alone that a "catastrophic result" is occurring or imminent. ADD-45a. And, as the district court observed, merely "throwing around phrases like 'national security' and 'energy emergency'" does not satisfy the stringent standards for a stay. *Id.*

Furthermore, Defendants wrongly contend that a stay is necessary because there is "no readily available means of obtaining incidental take coverage" for these mines. Mot. at 23. This assertion improperly discounts the ESA Section 10 permit process that applies to States and private parties.

As the district court explained, "Congress created two paths to ensure that 'incidental take' does not jeopardize protected species or adversely modify or destroy critical habitat: The first path, under Section 7, applies to federal agency actions, and the second, under Section 10, applies to non-federal actions." ADD-4a. In keeping with Congress's design, the Service has approved more than *1,300* Incidental Take Permits under Section 10.[3] Accordingly, any notion that the section 10 process cannot feasibly be employed to provide for take coverage—as Congress intended—flies in the face of the ESA as well as empirical reality.

### B. The Services' Rescission of the Definition of "Harm" Undermines Appellants' Arguments Regarding Irreparable Injury During the Pendency of this Appeal

Not only have Defendants failed to provide any specific instances of coal production actually being affected by the district court's ruling, but the entire premise underlying their assertion of irreparable harm has been undermined by the government's own recent change in policy regarding what constitutes a prohibited

[3] *See* Heather Harl et al., *Habitat conservation plans under the endangered species act: A comprehensive three-decade analysis*, 7(6) Conserv. Sci. and Practice e70061 (May 2025).

"take" under the ESA. On July 14, 2026, the agencies that implement the ESA (including the Service, a party to this lawsuit) finalized a rulemaking that rescinded the definition of "harm" under the ESA and, in so doing, published their formal position that "incidental take" no longer includes habitat destruction or degradation, including that which causes actual death or injury. 91 Fed. Reg. at 43304.

Not only does this dramatic policy change undermine Defendants' arguments regarding ESA Section 9 liability, it also renders senseless their position regarding the purported difficulty of processing section 10 permits. In the rule rescission, the Service explained that private parties seeking incidental take permits ("ITPs") under section 10 "will no longer need to articulate the 'impact' to species' habitat, explain how they will 'minimize and mitigate' habitat modification or degradation, or consider alternatives in service of mitigating habitat modification or degradation in their conservation plans in order to obtain an incidental take permit," and that "in issuing an [ITP], the Secretary of the Interior will no longer consider the effects of a proposed action on the species' habitat, nor will the permit contain terms and conditions requiring permittees to take into account habitat modification and degradation when executing the permitted take." *Id.*

This regulatory change is being challenged in federal court, including by the Center.[4] As it relates to this case, however, as the district court noted, "courts do not regularly presume that federal regulations will be found unlawful," ADD-46a, and, unless and until the Services' rulemaking is invalidated, the litany of harms set forth in Defendants' motion and supporting declarations will not materialize. As detailed in the 2020 BiOp as well as other record documents, the "take" that the Service previously regarded as resulting from coal mine permitting involves effects on listed species from habitat destruction and modification. *See, e.g.,* ECF 52-3 at 33 (OSMRE_0025725 at 28 (2020 BiOp)); *id*. at 58-60 (OSMRE_0025725 at 53-55). Thus, with the regulatory change to the definition of "harm" and the accompanying legal justification, Defendants cannot justifiably claim a "clear and present need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The very foundation of Defendants' motion—*i.e.,* that coal mining companies will face increased and unresolvable liability and/or will be unable to obtain the required coverage under Section 10—is belied by the Service's own just-completed rulemaking.

As in the district court, Defendants make no effort to "explain[] how existing coal mining would constitute a 'take' under the rule and thus be impacted by the

[4] *See Ctr. for Biological Diversity, et al., v. Burgum, et al.*, No. 2:26-cv-02474-TMC (W.D. Wash. July 14, 2026).

[district court's] decision at all during the appeal." ADD-46a. Instead, Defendants make the bizarre argument that they "are confident that the new rule will be upheld, but, at least in the meantime, primary states and mine operators will need take coverage before undertaking certain activities that risk liability under either the old or new interpretation of 'harm.'" Mot. at 16. However, the Service did not make its rule change contingent on it ultimately being "upheld"; rather, *it is in effect now*. And, according to the Service itself, it means that primacy States and mine operators *do not need any incidental take coverage* (under section 10 or otherwise) before undertaking activities that destroy and degrade habitat in areas occupied by listed species.[5]

If and when the rule change is vacated by a court, circumstances may change. But at this time and for the foreseeable future, Defendants cannot show any injury from the loss of incidental take coverage under the 2020 BiOp and ITS, let alone the serious irreparable injury necessary to support a stay.

---

[5] Lest there be any conceivable doubt along these lines, at the same time the rule change went into effect, the FWS Director issued an internal memorandum instructing all Service staff that "take" is no longer prohibited by the ESA unless the specific purpose of an action is to harm a listed species. *See* Catrin Einhorn, *Trump Administration Moves to Cut a Core Endangered Species Protection*, N.Y. Times, Sep. 17, 2026, https://www.nytimes.com/2026/09/16/climate/endangered-species-act-change.html.

### III. The Balance of Equities and Public Interest Also Weigh Against a Stay

Given Defendants' inability to demonstrate either likelihood of success on the merits or irreparable injury during the pendency of an appeal, their stay motion must be denied. While the Court need go no further, the Supreme Court has also instructed that the balance of equities and public interest factors weigh heavily in favor of protected species where, as here, serious violations of the ESA have been established. *See TVA v. Hill*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution'"); *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230 (D.D.C. 2003) ("Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species.") (citation omitted); *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) ("And when an injunction is being considered as a remedy for a violation of Section 7 of the ESA, the third and fourth factors are generally considered to tip in favor of the species.") (citation omitted); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 250 (D.D.C. 2020) (same).

There is no justification for deviating from these principles here. Contrary to the Defendants' and Amici's arguments, ensuring full compliance with the ESA is in the public interest and in no way undermines the cooperative federalism scheme

embodied in SMCRA. Rather, as the district court explained, in "enacting the SMCRA, Congress did not displace the ESA." ECF 53 at 34. Congress passed both laws, intending that they could, and would, work in conjunction, and providing the mechanisms, including through Sections 7 and Section 10 of the ESA, to achieve the objectives of each. Thus, Defendants have failed to show that the balance of equities or the public interest support their motion.

## CONCLUSION

For the reasons stated above, Defendants have failed to carry their heavy burden to demonstrate a stay is appropriate. The Court should, therefore, deny the stay request.

September 17, 2026.

Respectfully Submitted,

/s/ Hannah Connor
HANNAH CONNOR
ERIC GLITZENSTEIN
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 641-6176
hconnor@biologicaldiversity.org
eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 27(d)(2) and Circuit Rule 27(a)(2), I certify that this Motion complies with the type-volume limitation because it contains 4,312 words, excluding any accompanying documents exempted by Rule 27(a)(2)(B). I further certify that this Motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this Motion is written in Times New Roman 14-point font using Microsoft Word.

Dated: September 17, 2026

/s/ *Hannah Connor*

Hannah Connor
*Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2026, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Hannah Connor*
Hannah Connor
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 641-6176
hconnor@biologicaldiversity.org

*Attorney for Plaintiffs-Appellees*